BLAIR v. CLEAR CREEK OIL & GAS COMPANY.

Opinion delivered April 18, 1921.

1. MINES AND MINERALS—OIL AND GAS LEASE—ABANDONMENT.—If it was the duty of an oil and gas lessee to drill a protection well on the leased land to prevent it from being drained by wells on adjoining tracts, his refusal to drill would constitute an abandonment of the contract, and equity would afford relief.

2. APPEAL AND ERROR—OBJECTION TO JURISDICTION NOT RAISED BELOW.—The objection that equity had no jurisdiction can not be raised for the first time on appeal.

3. EQUITY—ADMINISTERING COMPLETE RELIEF.—When equity has acquired jurisdiction of a matter in a suit for one purpose, all matters in issue will be adjudicated and complete relief afforded.

4. MINES AND MINERALS—OIL AND GAS LEASE—DUTY TO EXPLORE.— Where an oil and gas lease authorizes the lessee to elect to pay a yearly rental, instead of drilling a well, the lessors can not recover damages for failure of the lessee to commence exploration for gas; but, where the lessee commences to explore for gas, it must exercise due diligence in drilling, and there is an implied covenant on its part to do so.

5.  MINES AND MINERALS—ACCEPTANCE OF RENTAL.—Acceptance of delayed rental by an oil and gas lessor precludes him from forfeiting the lease for failure to develop the lease during the term covered by the delayed rental.

6.  MINES AND MINERALS—OIL AND GAS LEASE—IMPLIED COVENANT TO PROTECT LESSOR.—Where a landowner leases to another the exclusive right to drill for oil and gas for a stipulated period of time, there is an implied covenant on the part of the lessee to protect the lessor against drainage, at least by wells drilled by him on adjoining property which will necessarily draw the gas from the lessor's land, and, in default of such protection wells being drilled by the lessee, the lessor may recover damages.

7.  MINES AND MINERALS — OIL AND GAS LEASE — FAILURE TO SINK WELLS—DAMAGES.—Though the damages recoverable by an oil and gas lessor from their lessee on account of draining the land of gas through wells on adjoining property without drilling protection wells on the leased lands may be difficult of determination and ascertainment, this fact is no bar to relief.

8.  MINES AND MINERALS—LIABILITY FOR PROPORTIONATE SHARE OF GAS.—An oil and gas lessee which violated its implied covenant to drill protection wells on the leased land to prevent its drainage through wells drilled by lessee on adjoining tracts is liable to the lessors for their proportionate share of the gas taken from the wells drilled by the lessee so near the boundary of the lease as to draw off the gas underneath their land.

9.  APPEAL AND ERROR—REVERSAL—REOPENING FOR FURTHER TESTIMONY.—Where a chancery case was not fully developed, the cause will, on reversal, be remanded with directions to take additional testimony.

10. MINES AND MINERALS—FAILURE TO SINK WELLS—MEASURE OF DAMAGES.—In a suit by oil and gas lessors to cancel the lease on the ground that the lessee was drawing off the gas from their land through wells drilled on adjoining land, without drilling protection wells on the leased lands, the measure of damages is the amount of royalty that the lessors should receive from the quantity of gas drawn from the leased premises.

Appeal from Crawford Chancery Court; *J. V. Bourland,* Chancellor; reversed.

STATEMENT OF FACTS.

Appellants brought this suit in equity against appellees to cancel a gas lease on the ground that appellees were drawing off the gas from appellants' land by means of wells drilled on adjacent lands near appellants'

boundary lines, and for damages resulting thereform. Appellee defended the suit on the ground that there was no liability under the terms of the lease upon which the suit is based.

The material facts are as follows:. What is known as the Kibler gas field was explored in the fall of 1915, and the first well was drilled by appellee in November, 1915. On the 24th day of November, 1915, E. T. and Mary Blair leased to appellee, Clear Creek Oil & Gas Company, 27 acres of land to be explored for oil and gas in the center of what is known as the Williams field, which is adjoining the Kibler field. Appellants leased to appellee the twenty-seven acres of land for the term of five years and as long thereafter as oil or gas might be produced in paying quantities. Appellee had the exclusive right to explore the land for oil and gas. If gas was found, it was provided that the lessee should pay the lessors one-eighth of the net proceeds of the sale of the gas. The lease further provides that, in case no well drilling operations for oil, gas, or other minerals is begun on the land within one year, all rights and obligations under the lease shall cease upon notice in writing being served on the lessee by the lessors, unless the lessee shall elect to continue the leasse in force by paying to the lessors an annual rental of $100, until a well is drilled, provided that when such well is drilled the above provided-for rental shall cease.

The Kibler field was first developed and most of the gas drawn from it. In the fall of 1918, the Williams field was explored for gas, and the first producing well was brought in some time in November or December of that year. Appellee had leases on the land west and north of the Blair land, known respectively as the Greig and Bryant lands. Appellee drilled two wells on the Greig land. The first well was drilled in the spring of 1919, and is about 400 feet northwest of the northwest corner of the Blair land. A second well was then drilled about 350 feet west of the Blair land and about one-quarter of a mile south of the first well. Appellee also,

in the spring of 1919, drilled a well on the Bryant tract, about 500 feet north of the Blair land. All of these wells produce gas and draw gas from the Blair land.

The testimony of experts shows that the Williams field is uniform in character, and that the gas producing sand is equally porous, and that gas will be drawn along all the radii of a circle of which the well is the center for a quarter of a mile.

The lessors and the lessee construed their lease to mean that payment of the reserve rental for delay in drilling should be made quarterly in advance. On the 4th day of June, 1919, the lessors wrote the lessee a letter calling attention to the fact that they had drilled wells on an adjoining tract near the boundary line of the 27-acre tract in question, and that the wells were producing a large amount of gas; that much of the gas coming from these wells was drawn from under the land of the lessors, and they demanded that the lessee should protect them by drilling a well at an early date on their land. The lessee failed or refused to comply with this demand, and on the 28th day of July, 1919, the lessors wrote the lessee another letter that the lease on the land in question had been canceled, because of the failure of lessee to drill protection wells on the land of the lessors as requested in their former letter.

Testimony was also introduced by appellants tending to show the amount of gas taken from the wells on the adjoining lands.

According to the testimony of appellee, it did not drill the wells on the adjoining lands for the purpose of drawing gas from the land of its lessors. In developing a gas field, it is necessary to take leases on large areas of land, and the drilling must necessarily be delayed on some of the land, and for this reason the leases provide for an annual rental for the delay. Appellee had only two sets of drilling machinery and was drilling wells on the land leased by it in the Williams field as fast as it was practicable after gas had been discovered in that field and a producing well brought in.

On the 3d day of November, 1920, the chancellor found the issue as to the cancellation of the lease in favor of appellants, but found against them on the question of damages. A decree was therefore entered of record, canceling the lease of appellants to appellee, but dismissing their cause of action for taking gas from their land through wells on the adjoining land by appellee.

The appellants have duly prosecuted an appeal to this court.

*C. M. Wofford* and *E. L. Matlock*, for appellants.

The court erred in refusing to allow appellants to recover damages for breach of the implied covenant to drill protecting wells against drainage. Thornton's Law of Oil and Gas, §§ 104, 121; 176 Pa. St. 502; 49 Ind. App. 602; 96 N. E. 19; 238 Ill. 397; 87 N. E. 381; 107 S. W. 609; 162 Ind. 395; 68 N. E. 1020.

*Hill & Fitzhugh,* for appellees.

Appellants had no remedy in equity, and their remedy, if any, was an action at law for damages. The lessor (plaintiff) could not claim and receive royalty under the lease and claim damages for alleged violation thereof during the same period.

The acceptance of rentals shows she was relying on the lease and is estopped from claiming that the lease was violated, or that she was entitled to damages during the period covered. 11 L. R. A. (N. S.) 419, note; L. R. A. 1917 A, p. 171.

That lessor can not complain of failure to drill during the period that he has accepted rentals for delay is well established by all the Federal authorities. 140 Fed. 801; 237 U. S. 856. Under these authorities plaintiff can recover no damages, and the court erred in canceling defendant's lease.

HART, J. (after stating the facts). The record in this case shows that appellee drilled three wells which produced gas on adjoining tracts of land so near to the boundary lines of appellants that the wells are drawing

the gas from underneath their land and in time will draw it all away. The only practical way to offset this is to drill protection wells on the land of appellants. It made no effort to drill protection wells. The lease does not contain any protection clause. The doctrine of protection is new in this State and arises from the fluid underground situation of either oil or gas.

On the part of appellants, it is claimed that when oil is drawn from underneath land by wells drilled near the boundary line which will obviously drain the land, there is an implied obligation on the part of the lessee to sink the number of wells necessary to protect the demised tract.

Counsel for appellants insist that, appellee having failed and refused to drill the protection wells as requested by appellants, or to account to them for the gas drawn from their land, the refusal constitutes a breach of the contract and entitles appellants to declare a forfeiture and to sue for the damages resulting therefrom.

Counsel for appellee contend that appellants had no remedy in equity, and that their remedy, if any, was an action at law for damages. In the first place, it may be said that, if it was the duty of appellee to drill a protection well, and it refused to do this, its refusal would constitute an abandonment of the contract, and equity would afford relief.

In the case of *Mauney* v. *Millar,* 134 Ark. 15, the court held that where the sole benefit of a contract results from a continued performance of the contract (such as to develop a mine, to operate it, pay royalties or to divide the proceeds), where one party completely abandons the performance thereof, equity will give relief by canceling the contract. For a partial breach the parties will be remitted to their remedies at law.

Moreover no objection was made or exceptions saved to the jurisdiction of the chancery court, and, under the repeated decisions of this court, the objection that equity had no jurisdiction can not be raised for the

first time on appeal. *Apple* v. *Apple,* 105 Ark. 669, and
cases cited.

It is well settled that, when equity has acquired ju-
risdiction of a matter in a suit for one purpose, all mat-
ters in issue will be adjudicated and complete relief af-
forded. *Horstmann* v. *LaFargue,* 140 Ark. 558.

This brings us to the question of whether there was
an implied covenant in the lease to protect appellants
against drainage, and, if so, what is the measure of dam-
ages recoverable for drainage through wells operated on
other lands adjacent to appellants' boundary lines.

The lease provides for a term of five years, and as
long thereafter as gas is produced in paying quantities.
The consideration for the first year is $1, and for each
succeeding year that operation or exploration is delayed
the lessee shall pay a yearly rental of $100 for the delay.
The lease expressly authorizes the lessee to elect to pay
a yearly rental, instead of drilling. Hence, the lessors
can not recover damages for failure of the lessee to com-
mence exploration for gas. If, however, the lessee com-
mences to explore for gas, it must exercise due diligence
in drilling, and there is an implied covenant on its part
to do so. *Mansfield Gas Co.* v. *Alexander,* 97 Ark. 167.
See, also, *Lawrence* v. *Mahoney,* 145 Ark. 310.

In the application of this principle, counsel for ap-
pellee contend that there was no implied covenant on
the part of appellee to sink protection wells on the land
of appellants. They contend that the rule only applies
where the lessee has in part developed the leased prem-
ises and produced wells. To support their contention they
cite the case of *Carper* v. *United Fuel Gas Co.* (W. Va.),
L. R. A. 1917 A, p. 171. In that case it was held that the
lessor is not entitled to recover damages for failure to
drill offset wells to prevent drainage, while the lessee
exercises his optional right to pay money in lieu of drill-
ing, and the lessor accepts it.

The court did hold, however, that there was an im-
plied obligation on the part of the lessee to drill a well
for protection against drainage, upon necessity therefor,

and the lessor's demand for such action, within any rental period for which rent has been paid, with notice of intention to refuse to accept further rentals, and the right in the lessor to declare a forfeiture of the lease for noncompliance with such demand would afford full and ample protection from such losses.

We think it perfectly sound to, say that the acceptance of delayed rental precludes the lessor from forfeiting the lease for failure to develop during the term covered by the delayed rental. In such a case the lessor still has the gas and has received the reserved rent for the delay in drilling.

In a case like the present one, however, the facts are essentially different, and a forfeiture of the lease would not afford adequate protection to the lessor. The lessee has the sole and exclusive right to drill. Should the lessee fail to drill a protection well after a producing well has been brought in near the lessor's boundary lines on adjacent lands, such well might draw off a material portion of the gas under the lessor's land before he could declare a forfeiture and procure some one else to drill an offset well.

The record shows that drilling wells is very expensive, and is only undertaken where the lessee has a large area of acreage in a block. It is a matter of common knowledge that the landowner is not equipped with machinery for drilling and could not purchase such machinery on short notice, if able to do so. Hence, when he leases his land to another with the exclusive right to drill for oil and gas on it for a stipulated period of time, there is an implied covenant on the part of the lessee to protect the land at least from wells drilled by him on adjoining property which will necessarily draw the gas from the lessor's land. If there had been no lease on his land, the lessor could have had all the time during which the wells were drilled on adjoining land to have arranged for the drilling of an offset well on his land in case a producing well was brought in on the adjoining land which would draw the gas off his own land. Of course,

if he failed to make such an arrangement, the loss would fall upon himself. In case, however, he has leased his land to another and has given the lessee the exclusive right to drill on his land for gas, it is obvious that the mere right of forfeiture in case the lessee would not drill a protection well would not afford him adequate relief. The practical test is to be found in the question, are the outside wells, as for example, the wells on the Grieg and Bryant tracts, draining the Blair land to such an extent that, if the wells on the Grieg and Bryant tracts were operated by a third party, appellee as lessee of the Blair tract, would find it good management to put down protection wells to save its own leased territory from exhaustion? If so, then good faith to its lessors would require it to put down the protection wells that the lessors might get their royalties under the lease, or at least be protected from having the gas drawn from their lands. In this connection we quote with approval from the case of *Carper* v. *United Fuel Gas Co., supra,* the following: "To say the lessor intended to permit the oil and gas in his land to be withdrawn from it otherwise than through wells drilled on it under the lease, and thus to let it go to other persons for nothing, as an incident of his procurement of a small money rental for two, five, or ten years, would be inconsistent with reason, and contrary to the legal principles governing the relation of landlord and tenant or licensor and licensee. For the rental reserved, he is neither selling his oil or gas, nor relinquishing his ownership thereof, nor consenting to severance or abstraction thereof. He expects it to remain in the land until the rental period ends, whether it ceases by the drilling of a well or expiration of the term. Nor can it be doubted that the lessee contemplated the same result. Neither could have intended that he should take out the mineral through wells on other lands. The words of his lease contemplate his extraction of the oil and gas through wells to be drilled by him on the land, and so emphatically deny any such intent on his part. The rental is for delay, not destruction. If, by the negligence

or misfeasance of a tenant, the demised property is materially injured, he is liable for the resultant damages, and the landlord may recover the amount thereof from him within the term, notwithstanding he has paid the rent or is bound to pay it. *Moses* v. *Old Dominion Iron & Nail Works Co.*, 75 Va. 95, 102. If a tenant commit waste, an action lies against him. The landlord is not limited to his rent as compensation. In these cases there need not be an express covenant against waste, nor an express agreement to pay the resulting damages. They are implied, if not expressed."

The contract is a lease of the land for the purpose of drilling for oil and gas for the period of time designated therein, and the lessee has a vested right to the possession of the land to the extent reasonably necessary to perform the terms of the agreement on his part. Therefore there is an implied covenant on the part of the lessee to protect the lessor against drainage, and, in default thereof, the lessor may recover damages.

We think this view is supported by the authorities cited below, and in any event that it is in accord with the better reasoning on the question. *J. M. Guffey Petroleum Co.* v. *Jeff Chaison Townsite Co.* (Tex. Ct. Civ. App.), 107 S. W. 609; *Powers* v. *Bridgeport Oil Co.* (Ill.), 87 N. E. 381; *Kleppner* v. *Lemon* (Penn.), 35 Atl. 109; *Culbertson* v. *Iola Portland Cement Co.* (Kan.), Ann. Cas. 1914 A, p. 610; *Harris* v. *Ohio Oil Co.* (Ohio), 48 N. E. 502; *Kelley* v. *Ohio Oil Co.*, 57 Ohio St. 317, 39 L. R. A. 765; *Kellar* v. *Craig*, 126 Fed. 630 and Thornton on Oil and Gas (3 ed.), vol. 1, par. 109 and vol. 2, par. 882.

What is the measure of damages recoverable for drainage through wells operated by defendants on their lands near the plaintiffs' boundary line may be difficult of determination and troublesome to ascertain, but that is no bar to relief in such cases. For example, suppose in the present case the record should show that appellee had drilled wells on the adjacent lands near to the boundary lines of appellants for the very purpose of drawing the gas from underneath their lands through

these wells, it is obvious that such conduct of the appellees would be fraudulent and actionable. Or suppose, as in the case of *Millar* v. *Mauney,* 142 Ark. 486; the evidence had showed that the formation on the leased land was of such a character that it was not practicable to drill through it, but that the gas could be best drawn from underneath the land by drilling a well on the adjacent land outside of the leased premises and the wells on the Bryant and Greig tracts has been drilled by appellees there on this account, the failure on the part of the lessee to pay the royalty agreed upon would be actionable. In either of the supposed cases the measure of damages would be the same as in the cases of a breach of an implied covenant to protect the demised premises against drainage. To hold otherwise would to be deny relief in a just case because of the difficulty of ascertaining the amount of loss suffered by the wrongful action of the offending party.

It appears from the record that expert witnesses acquainted with the gas field may testify with reasonable accuracy as to the number of wells which should have been drilled on the leased land for protection from drainage. Such witnesses might also testify with reasonable accuracy as to the quantity of gas obtained from the wells. They did say that the sand in which the gas was found was sufficiently porous that a well would draw from underneath the ground gas for a distance of a quarter of a mile in all directions. The record in the case also shows that the three wells operated by appellee on the adjacent tract will in due course of time draw all the gas from underneath the land of appellants. The lessee under the facts disclosed by the record, is liable to the lessors for their proportionate share of the gas taken by the wells drilled so near their boundary lines as to draw off the gas underneath their land. There is no reason why it can not be ascertained with reasonable certainty what quantity and quality of gas has been and will be taken from appellant's land through the wells drilled and operated by appellee on the adjoining land. *Culbertson* v.

*Iola Portland Cement Co.* (Kan.), Ann. Cas. 1914 A, p. 610, 125 Pac. 81.

This is a new question in this State, and it does not appear that the testimony on the measure of damages was fully developed. Therefore, upon the remand of the case, the chancery court is directed to allow either party to take additional testimony on this point within a reasonable time to be allowed by the court or the chancellor thereof, if the parties shall be so advised. *Tankersley* v. *Norton,* 142 Ark. 339; *Rushing* v. *Horner,* 135 Ark. 201; *Bank of Des Arc* v. *Moody,* 110 Ark. 39, and *McClintock* v. *Robertson,* 98 Ark. 595.

For the error in refusing to allow appellants to recover damages against appellee for the breach of the implied covenant to drill protection wells against drainage, the decree will be reversed and the cause remanded for further proceedings in accordance with the opinion.

### OPINION ON REHEARING.

HART, J. We adhere to our original opinion that there was an implied covenant on the part of the lessee to sink a protection well or wells on the land of the lessor, and that it can not escape liability for the breach of its implied covenant to protect the lines of the leased premises on the ground that the damages for the breach are difficult of exact ascertainment. Because the nature of the inquiry makes it practically impossible to ascertain with certainty the exact amount of the lessor's damage, is no reason why the lessor should not have an action for damages for breach of the implied covenant. It is true the law does not permit a witness to speculate or conjecture as to probable damages, yet experienced persons who are acquainted with the gas-bearing conditions of the lands in the locality of the leased premises can give an opinion as to the amount of gas drawn off the premises and lost by the failure of the lessee to comply with its implied covenant. The rule is that, while the law will not permit witnesses to speculate or conjecture as to possible or probable damages, still the best evidence of which

the subject will admit is reasonable, and there is often nothing better than the opinion of well-informed persons upon the subject under investigation. Chamberlayne on Modern Evidence, vol. 3, §§ 2331-32, and *St. L., I. M. & S. Ry. Co.* v. *Brooksher*, 86 Ark. 91.

From the evidence already taken, it would seem that the sand-producing gas on the leased premises and the land adjacent thereto is of uniform character, and that expert witnesses can with a reasonable amount of certainty tell the amount of gas that will be drawn from the leased premises by the wells dug near the boundary line by the lessee on the adjacent premises. When the amount of gas that will be drawn from the leased premises is ascertained, the amount of damages to be recovered can be readily fixed by the royalty that the lessor was to receive.

The evidence in the record shows that the lessee never intended to sink protection wells, and it claims that, under the terms of the lease, it was not required to do so. The lessee drilled three gas wells, one after the other, near the lessor's boundary lines on adjacent premises. This shows that it never intended to drill a protection well or wells on the leased premises. The evidence also shows that these wells would draw gas from a quarter of a mile in all directions, and that the character of the gas-bearing sand was such that the gas would all be drawn off of the leased premises by these wells. Hence, under the evidence disclosed by the record, the measure of damages in the present case will be the amount of royalty that the lessors should receive from the quantity of gas which has been or may hereafter be proved to have been drawn from the leased premises. The question of what time would constitute due diligence or delay in drilling protection wells does not arise in the present case, because, as we have already explained, the record shows that the lessee never intended to sink such wells.

It follows that the motion for rehearing will be denied.